UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DISH NETWORK, LLC,          )      Case No. 1:08CV1540
                              )
        Plaintiff,        )
                              )
        vs.           )      JUDGE CHRISTOPHER BOYKO
                              )      (Magistrate Judge McHargh)
FUN DISH INC., et al,        )
                              )
        Defendants.    )      REPORT AND
                              )      RECOMMENDATION
                              )

McHARGH, Mag.J.

Currently before the court is plaintiff's motion to dismiss three of defendants' counterclaims.  (Doc. 94.)

The plaintiff DISH NETWORK, L.L.C. ("DISH Network") filed a third amended complaint against defendants Fun Dish, Inc.; Fun Dish of Florida, Inc. ("Fun Dish of Fla."); and Dish 1 Up Satellite, Inc. ("Dish 1 Up"), alleging eight causes of action, against various combinations of the three defendants:  1) unfair competition in violation of the Lanham Act, § 43, 15 U.S.C. § 1125(a); 2) deceptive trade practices, in violation of the Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02; 3) common law unfair competition; 4) common law trademark infringement; 5) trademark infringement in violation of the Lanham Act, § 32, 15

U.S.C. § 1114(1)(a); 6) common law trademark and trade name infringement; 7) trademark infringement in violation of the Lanham Act, § 32, 15 U.S.C. § 1114(1)(a); and, 8) common law trademark infringement.  (Doc. 74, Third Amended Complaint (hereinafter, "Am.Compl."); see also docket entry of Apr. 13, 2009, granting leave to amend.)

The third amended complaint alleges, for example, that several of the defendants were involved in the use of "confusingly similar phone numbers[1]," to mislead and confuse consumers.  See, e.g., doc. 74, Am.Compl., at ¶¶ 10-16.  The complaint also alleges that defendants have used, without authorization, DISH Network's name and federally registered trademarks and logos.  Id. at ¶ 19.  Additional allegations are also set forth.  See generally doc. 74, Am.Compl.

The plaintiff DISH Network is one of the nation's two largest providers of direct broadcast satellite ("DBS") television service.  (Doc. 74, Am.Compl., at ¶ 9.)  Defendant Dish 1 Up is a retailer of DirecTV.[2]   Dish 1 Up operates call centers in Ohio and Arizona, which involve the "confusingly similar phone numbers" at issue.  (Doc. 74, Am.Compl., at ¶¶ 10-16; doc. 89, Counter-Complaint, at ¶ 13.)  The "confusingly similar phone numbers" are toll-free numbers owned by defendant Fun

---

[1]  The Third Amended Complaint alleges that the primary telephone number of DISH Network is 800-333-DISH (3474), and that defendant Fun Dish of Fla. has acquired the "confusingly similar phone numbers" of 888-333-DISH (3474) and 866-333-DISH (3474), where the only difference from DISH Network's number is a different (toll-free) prefix.  (Doc. 74, Third Am.Compl., at ¶¶ 10-11.)

[2]  DirecTV, the nations's other largest provider of satellite television service, and the primary competitor of DISH Network, is not a party in this action.

Dish of Fla., calls to which are answered by Dish 1 Up.  (Am.Compl., at ¶¶ 10-13.)
The complaint alleges that Defendant Fun Dish  processes credit card transactions
for Dish 1 Up.  Id. at ¶ 22.

The defendants filed an answer, and an amended counter-complaint, which
alleges eleven causes of action against DISH Network.  (Doc. 89.)  The first, third,
and fourth causes of action seek to have the court cancel various trademark
registrations, pursuant to 15 U.S.C. §§ 1064 and 1119.  The second cause of action
seeks declaratory judgment, finding a trademark invalid, pursuant to the Lanham
Act, 15 U.S.C. §§ 1115 and 28 U.S.C. § 2201(a).  The fifth, sixth, and seventh causes
of action seek to have the court refuse registration of pending trademark
applications, pursuant to 15 U.S.C. §§ 1052 and 1119.  The eleventh cause of action
alleges trademark infringement in violation of 15 U.S.C. § 1114(1)(a).  Id.

DISH Network's motion to dismiss (doc. 94) attacks the other three of
defendants' counterclaims, the eighth, ninth, and tenth.  The eighth alleges an
antitrust violation of the Sherman Act, Sect. 2, 15 U.S.C. §§ 2, 4.  (Doc. 89, Counter-
Complaint, ¶¶ 66-73.)  The ninth cause of action alleges common law unfair
competition.  Id. at ¶¶ 74-77.  The tenth alleges common law tortious interference
with prospective business advantage.  Id. at ¶¶ 78-81.

The defendants/ counter-plaintiffs have filed a memorandum in opposition to
the motion to dismiss (doc. 99), and DISH Network has filed a reply brief in support
(doc. 100).  In addition, the court held an oral hearing on the motion.  (Doc. 107,
transcript of proceedings.)

3

## I.  MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Until fairly recently, the standard for a motion to dismiss for failure to state
a claim upon which relief can be granted was that the motion establish, beyond a
reasonable doubt, that "the plaintiff can prove no set of facts in support of his claim
which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957);
Wright v. Metrohealth Med. Ctr., 58 F.3d 1130, 1138 (6th Cir. 1995), cert. denied,
516 U.S. 1158 (1996).  However, in Bell Atlantic Corp. v. Twombly, 550 U.S. 554
(2007), the Supreme Court modified the standard, in particular the "no set of facts"
phrase.

The Court's ruling in Twombly abrogated Conley, and moved away from the
pure notice pleading standards that had previously been a hallmark of the Civil
Rules.  See, e.g., Twombly, 550 U.S. at 572-588 (Stevens, J, dissenting); Association
of Cleveland Fire Fighters v. City of Cleveland, 502 F.3d 545, 548 (6th Cir. 2007)
(Twombly "disavowed" Conley standard).  See generally Silva v. Hollis, No.
3:08CV2589, 2009 WL 1270297, at *1 (N.D. Ohio May 5, 2009) (Carr, J.) (applying
Twombly); Dhillon v. Cleveland Clinic Found., No. 5:07CV3505, 2009 WL 901870,
at *1-*2 (N.D. Ohio Mar. 31, 2009) (Adams, J.) (same); Frost v. Boyle, No. 1:06 CV
2649, 2008 WL 650323 (N.D. Ohio Mar. 5, 2008) (Oliver, J.) (Twombly abrogated
Conley standard).

The Court in Twombly characterized Conley's heretofore universally-accepted[3] "no set of facts" phrase as ". . . best forgotten as an incomplete, negative gloss on an accepted pleading standard:  once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  Twombly, 550 U.S. at 563; Cleveland Fire Fighters, 502 F.3d at 548 (quoting Twombly).  The Court stated that Conley merely "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival."  Twombly, 550 U.S. at 563.  The question inevitably arises:  How then is a claim "stated adequately"?

The Twombly Court asserted:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

Twombly, 550 U.S. at 555 (citations omitted).  See also Gunasekera v. Irwin, 551 F.3d 461, 466 (6th Cir. 2009); Cleveland Fire Fighters, 502 F.3d at 548 (quoting Twombly).  The Court protested that "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."

---

[3] See, e.g., Twombly, 550 U.S. at 577-578 (citing cases) (Stevens, J., dissenting); O'Brien v. University Community Tenants Union, Inc., 42 Ohio St.2d 242, 327 N.E.2d 753 (1975) (syllabus).

Twombly, 550 U.S. at 570.  Compare 5 Wright & Miller, Federal Practice and Procedure, § 1216 (2004) ("Conspicuously absent from Federal Rule 8(a)(2) is the requirement found in the [earlier] codes that the pleader set forth the 'facts' constituting a 'cause of action'.")  Justice Stevens, in dissent, characterized the decision as a "dramatic departure from settled procedural law."  Twombly, 550 U.S. at 573 (Stevens, J, dissenting).

In Ashcroft v. Iqbal, the Court clarified that the new Twombly standard is not intended to be limited to complicated litigation, such as the antitrust conspiracy case in Twombly.  Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009).  The Court asserted that the new pleading standards governing Rule 8(a) do not require "detailed factual allegations," however they do require "factual enhancement."  Iqbal, 129 S.Ct. at 1949.  Only "a complaint that states a plausible claim for relief" will survive a motion to dismiss.  Id. at 1950.

The Court summarized its new "plausibility" standard as follows:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. 554).  See, e.g., Boykin v. KeyCorp, 521 F.3d 202, 213 (2d Cir. 2008) (plausibility standard).  In other words,

6

when resolving a motion to dismiss, the court is now required to locate the allegations of the complaint on a possibility – plausibility[4] – probability continuum. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555).

The Supreme Court stated that "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." Twombly, 550 U.S. at 563 n.8. The function of the court in ruling on such a motion is not to weigh the evidence, nor to appraise the credibility of witnesses. Miller v. Currie, 50 F.3d 373, 377 (6th Cir. 1995). Rather, the court is simply to determine "whether a complaint states a plausible claim for relief." Iqbal, 129 S.Ct. at 1950.

A motion to dismiss for failure to state a claim upon which relief can be granted is procedural, and tests the sufficiency of the complaint. Miller, 50 F.3d at 377; State ex rel. Hanson v. Guernsey County Bd. of Comm'rs, 65 Ohio St.3d 545, 548, 605 N.E.2d 378, 381 (1992). The court must construe the complaint in the light most favorable to the plaintiff, and, for the purposes of this motion, accept all factual allegations as true. Central States Pension Fund v. Mahoning Nat'l Bank,

---

[4] The word "plausible" is defined as "seemingly true, acceptable, etc." Webster's New World College Dictionary, at 1104 (4th ed. 2007). Similarly, Webster's Third New International Dictionary defines "plausible" as "superficially worthy of belief : credible." The Oxford English Dictionary defines "plausible" as "seeming reasonable, probable, or truthful; convincing, believable."

7

112 F.3d 252, 255 (6th Cir. 1997). However, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 129 S.Ct. at 1950 (quoting Twombly, 550 U.S. at 555).[5]

## II. SHERMAN ACT, ANTITRUST VIOLATIONS

The eighth counterclaim alleges antitrust violations of the Sherman Act, Sect. 2, 15 U.S.C. §§ 2, 4. (Doc. 89, Counter-Complaint, ¶¶ 66-73.) Section 2 of the Sherman Act reads, in part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . ." Re/Max Int'l, Inc. v. Realty One, Inc., 173 F.3d 995, 1002 (6th Cir. 1999) (quoting Sherman Act). Monopolization claims under Section 2 properly consist of two elements:

> (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

___

[5] Presumably, certain of the Forms provided in accordance with Civil Rule 84 will be eliminated or modified. See, e.g., Fed. R. Civ. P. 84, Appendix, Form 11 ("On date, at place, the defendant negligently drove a motor vehicle against the plaintiff") and Form 15 ("On date, at place, the defendant converted to the defendant's own use property owned by the plaintiff"). Although these Forms "illustrate the simplicity and brevity," Fed. R. Civ. P. 84, that the Rules formerly contemplated, under Twombly and Iqbal, the allegations as set forth in Forms 11 and 15 would surely fail as "legal conclusions [of negligence and conversion] couched as factual allegation[s]." Iqbal, 129 S.Ct. at 1950.

Re/Max, 173 F.3d at 1016 (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-571 (1966)).  (Section 4 concerns the jurisdiction of this district court.  15 U.S.C. § 4.)

The counterclaim alleges that the "predatory and anticompetitive acts" engaged in by DISH Network include:

> a) securing an invalid trademark registration for the generic word "DISH" on the basis of an inadequate and biased survey, and engaging in other conduct in the Trademark Office intended to bring about this improper result;
>
> b) improperly claiming exclusive common law trademark rights in "vanity" telephone numbers to which Plaintiff has no legitimate claim;
>
> c) improperly asserting exclusive trademark rights to marketing phrases that contain the generic word "DISH", so as to prevent retailers serving Plaintiff's only competitor from marking legitimate marketing uses of such phrases; and
>
> d) Engaging in numerous other anti-competitive acts with respect to the word "DISH", including threatening enforcement actions, with the specific intent of impeding retailers for Plaintiff's only competitor from servicing and obtaining customers.

(Doc. 89, Counter-Complaint, at ¶ 69.)  It is further alleged that DISH Network's "invalid and unsupported trademark registrations and subsequent enforcement efforts" were instituted "to interfere directly with the business relationships of DirecTV and DirecTV's retailers," rather than to protect a valid property right.  Id. at ¶ 70.

The motion to dismiss the defendants' Sherman Act counterclaim is based on several theories.  First, the motion argues that the defendants/ counter-plaintiffs fail to plead an "antitrust injury."  (Doc. 94, at 5-8.)  Second, the counterclaim

should fail because the defendants do not allege "antitrust standing."  Id. at 8-10.

Third, the antitrust counterclaim should fail because the defendants do not allege a

plausible "attempted monopoly."  Id. at 10-15.  Finally, the Sherman Act

counterclaim must fail because the conduct at issue is protected by the Noerr-

Pennington Doctrine.  Id. at 15-18.


## A. Antitrust Standing

The Supreme Court has established that "the irreducible constitutional

minimum of [Article III] standing contains three elements."  First, the plaintiff

must have suffered an "injury in fact," a concrete injury to a legally protected

interest.  Second, there must be a causal connection  between the injury and the

challenged conduct, "fairly traceable" to the defendant.  Finally, it must be "likely"

that the injury will be redressed by a favorable decision.  Lujan v. Defenders of

Wildlife, 504 U.S. 555, 560-561 (1992); NicSand, Inc. v. 3M Co., 507 F.3d 442, 449

(6th Cir. 2007) (en banc).  Yet federal courts have held that "antitrust standing"

goes beyond ordinary Article III standing.  NicSand, 507 F.3d at 449.

Antitrust standing is a threshold inquiry.  NicSand, 507 F.3d at 449.  In

Southaven Land Co. v. Malone & Hyde, Inc., the Sixth Circuit summarized the test

for antitrust standing as consisting of five factors:

> (1) the causal connection between the antitrust violation and harm to
> the plaintiff and whether that harm was intended to be caused; (2) the
> nature of the plaintiff's alleged injury including the status of the
> plaintiff as consumer or competitor in the relevant market; (3) the
> directness or indirectness of the injury, and the related inquiry of

10

whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

Re/Max, 173 F.3d at 1022 (quoting Southaven Land Co. v. Malone & Hyde, Inc., 715 F.2d 1079, 1085 (6th Cir. 1983)).  An antitrust claimant "must do more than make 'allegations of consequential harm resulting from a violation of the antitrust laws.'"

NicSand, 507 F.3d at 449 (quoting Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 545 (1983)).

DISH Network argues that the counterclaim should fail because the defendants do not allege "antitrust standing."  (Doc. 94, at 8-10.)  The defendants/ counter-plaintiffs respond that they have standing to sue in the relevant market. (Doc. 99, at 8.)  They contend that they have alleged that DISH Network "engaged in numerous anticompetitive and predatory acts impacting competition in both the DBS mark[et] and retail services market."  Id.  (The parties agree that the geographic scope of the market(s) is nationwide.)

The counter-complaint alleges that DISH Network "seeks to advance impermissibly its competitive standing in the highly-concentrated satellite marketplace against [non-party] DirecTV, its only real competitor, by depriving DirecTV's network of third-party resellers, retailers, and installers of their ability to market to customers."  (Doc. 89, Counter-Complaint, at 13.)  It is also alleged that DISH Network's anticompetitive conduct,

> specifically its blatant attempt to restrict legitimate marketing uses by the retailers serving its sole competitor of generic and descriptive terms which Plaintiff has no right to monopolize . . . and its use and

11

prosecution of its invalid marks so as to facilitate monopolization of the
satellite television service marketplace and the network of retailers
used to market and sell satellite television service.

Id. at 13-14.

The eighth cause of action, based on the Sherman Act, specifically alleges
that DISH Network "has engaged in predatory conduct with the specific intent to
monopolize both the DBS market and the market for retail services for DBS . . ."
(Doc. 89, Counter-Complaint, at ¶ 68.)  It continues:

> The DBS market and the retail services market are highly
> concentrated. There are two leading DBS services, DirecTV and
> Plaintiff, with approximately 55% and 45% of market share
> respectively.  While DBS is one form of delivery of home
> entertainment, it contains unique characteristics that make it a
> distinct market in the larger home entertainment market.  In the
> retail services market, retailers compete for customers, but are subject
> to licensing terms and other restrictions set by DBS providers. Thus,
> while there is independent competition between retailers in the
> retailer services market, that competition is limited and constrained
> by the actions of the DBS providers. The relevant geographic markets
> are national in scope for both the DBS market and the retailer services
> market.

(Doc. 89, Counter-Complaint, at ¶ 71.)  Thus, it appears that the defendants
attempt to allege standing in two separate (albeit related) markets. See doc. 99, at
8.

The court raised this issue at oral argument, and counsel for DISH Network
voiced the opinion that the defendants were relying on the retail market, and had
abandoned the direct satellite transmission market.  (Doc. 107, Tr., at 7.)  Counsel
also maintained that the retailers market "has thousands and thousands of
competitors."  Id.

12

Counsel for the defendants denied that they had abandoned their claims as to either market.  (Doc. 107, Tr., at 30.)  Defendants state they "have alleged competitive injury to participants in the retail services market."  Id.  They claim that "DirecTV is not really a better plaintiff," because the allegedly anticompetitive acts "are directed at retailers who use 800 numbers."  Id. at 31.  They contend that DISH Network has "focused on the retailers themselves."  Id.

Their argument appears to be that, because DBS companies market in large part through retailers, and DISH Network is attempting to restrict competition in the retail services market, DISH Network "is improperly trying to enhance its position in the broader DBS market."  (Doc. 99, at 8-9.)

The court finds that the allegations of the counterclaims do not support a claim that Fun Dish and the other defendants have antitrust standing as to the DBS market.  First of all, none of the defendants/ counter-plaintiffs are alleged to be "a consumer, competitor or participant" in the DBS market.  See generally Southaven Land, 715 F.2d at 1086; see also Caruana v. General Motors Corp. No. 05-5458, 2006 WL 2873178, at *5 (6th Cir. Oct. 5, 2006).  A commercial intermediary, such as a sales representative, lacks standing because any antitrust injury would be too remote.  Serpa Corp. v. McWane, Inc., 199 F.3d 6, 11 (1st Cir. 1999) (citing cases).

In addition, the allegations of the counterclaim establish "the existence of more direct victims of the alleged antitrust violation."  Re/Max, 173 F.3d at 1022; Southaven Land, 715 F.2d at 1085, 1087.  The counter-complaint alleges that DISH

13

Network "seeks to advance impermissibly its competitive standing in the highly-concentrated satellite marketplace against DirecTV, its only real competitor." (Doc. 89, Counter-Complaint, at 13.)  The defendants argue that, by attempting to restrict competition in the retail services market, DISH Network "is improperly trying to enhance its position in the broader DBS market." (Doc. 99, at 8-9.)  It is clear that the more direct victim of the alleged antitrust violations in the DBS market would be DirecTV, which is not a party to this action, rather than the defendants/ counter-plaintiffs.  Thus, the allegations do not support a plausible claim that the defendants have antitrust standing as to the DBS market.

The defendants have alleged competitive injury to participants in the retail services market, because the anticompetitive acts "are directed at retailers who use 800 numbers." (Doc. 107, Tr., at 30-31.)  They contend that DISH Network has "focused on the retailers themselves." Id. at 31.  The court will examine next the nature of the alleged injury to the retail services market.


## B.  Antitrust Injury

The element of "antitrust injury" is a "necessary, but not always sufficient" condition of antitrust standing.  CBC Cos., Inc. v. Equifax, Inc., 561 F.3d 569 (6th Cir. 2009) (citing Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 110 n. 5 (1986)); NicSand, 507 F.3d at 450.  That type of injury has specific connotations under the law:

14

> An antitrust claimant must show more than merely an "injury causally linked" to a competitive practice; it "must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful."

NicSand, 507 F.3d at 450 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).  This standard governs because the antitrust laws were enacted for the protection of competition, not competitors.  Caruana, 2006 WL 2873178, at *4 (quoting Brunswick, 429 U.S. at 488).

The key inquiry is whether "competition," not merely a competitor, suffered as a result of the alleged antitrust violation.  CBC Companies, 561 F.3d at 572. Thus, unless the plaintiff alleges "an injury that arises from 'an anticompetitive aspect of the practice under scrutiny,'" the complaint will be subject to dismissal. Id.  The Sixth Circuit "has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation."  Caruana, 2006 WL 2873178, at *5 (quoting Valley Prods. Co. v. Landmark, 128 F.3d 398, 403 (6th Cir. 1997)).

The eighth counterclaim alleges that DISH Network has engaged in predatory conduct

> . . . by impermissibly restricting retailers of its sole competitor, including Dish 1 Up, from legitimately competing for and serving customers and from using "800" numbers containing a generic or descriptive term that they are entitled to use.  Plaintiff's knowing assertion of meritless and invalid trademark claims is a significant aspect of its attempt to monopolize the retail services market.

(Doc. 89, Counter-Complaint, at ¶ 68.)  The specific "predatory and anticompetitive

acts" include 1) securing an invalid trademark registration for the generic word

"DISH", 2) improperly claiming exclusive common law trademark rights in "vanity"

telephone numbers[6], 3) improperly asserting exclusive trademark rights to

marketing phrases that contain the generic word "DISH", and 4) engaging in

numerous other anti-competitive acts with respect to the word "DISH", including

threatening enforcement actions.  Id. at ¶ 69.

Registration of a trademark gives rise to a rebuttable presumption that the

trademark is valid.  Fuji Kogyo Co., Ltd. v. Pacific Bay Int'l., Inc., 461 F.3d 675, 683

(6th Cir. 2006), cert. denied, 549 U.S. 1252 (2007); National Tuberculosis Ass'n v.

Summit County Tuberculosis & Health Ass'n, 122 F.Supp. 654, 657 (N.D. Ohio

1954).  Although several of the defendants' other counterclaims challenge the

validity of the registered trademarks, the court has not ruled on those claims, and

the registered trademarks are presumptively valid at this point.

This court has rejected claims that efforts to register or protect trademark

rights constitute violations of the Sherman Act.  Weber v. National Football

League, 112 F.Supp.2d 667 (N.D. Ohio 2000).  Federal courts have found that

"efforts to protect trademark rights, even those that go as far as bringing suit

---

[6]  As mentioned earlier, the Third Amended Complaint alleges that the
primary telephone number of DISH Network is 800-333-DISH (3474), and that
defendant Fun Dish of Fla. has acquired the "confusingly similar phone numbers" of
888-333-DISH (3474) and 866-333-DISH (3474), where the only difference from
DISH Network's number is a different (toll-free) prefix.  (Doc. 74, Third Am.Compl.,
at ¶¶ 10-11.)

against a party who has allegedly infringed upon or diluted the trademark owner's rights . . . do not constitute violations of antitrust laws." Weber, 112 F.Supp.2d at 672-673 (citing cases).  The Weber court noted that "legal efforts to protect trademark rights simply do not constitute a restraint of trade in violation of antitrust laws." Id. at 673.  See also Clorox Co. v. Sterling Winthrop, Inc., 117 F.3d 50, 56 (2d Cir. 1997); Blue Cross & Blue Shield Ass'n v. Group Hospitalization & Med. Serv., Inc., 744 F.Supp. 700, 719 (E.D. Va. 1990) (good faith efforts to enforce trademark rights do not violate Sherman Act); Deflecta-Shield Corp. v Kar-Rite Corp., No. 85-C-5743, 1986 WL 4186, at *3 (N.D. Ill. Mar. 28, 1986); Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 298 F.Supp. 1309, 1314 (S.D. N.Y. 1969), aff'd, 433 F.2d 686 (2d Cir. 1970), cert. denied, 403 U.S. 905 (1971) ("in almost every reported instance where the antitrust misuse of a trademark has been raised as a defense, it has been rejected").

The cases primarily cited by defendants (doc. 99, at 6) do not involve allegations of antitrust violations, and are inapposite.  For example, 800 Spirits, Inc. v. Liquor by Wire, Inc., was a trademark infringement action.  800 Spirits, Inc. v. Liquor by Wire, Inc., 14 F.Supp.2d 675 (D. N.J. 1998).  The plaintiff alleged infringement of its "unregistered trade name and service mark '800 SPIRITS'." Id. at 676.  The court dismissed the action, and found that "plaintiff assumed the risk of any potential confusion by (1) deliberately selecting a service mark that consisted of a toll-free area code and a generic term." Id. at 681.  The court found that the number 800 is a functional term that represents a toll-free area code, which could

17

not be combined with a generic term as a protected service mark.  Id.  However, the case did not involve any allegations that efforts to protect the mark constituted violation(s) of the Sherman Act.  Similarly, Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc., 781 F.2d 604 (7th Cir. 1986), involved allegations of "trade dress" infringement, but no alleged antitrust violations.

In Comptek Research, however, the  counterclaim was that plaintiff "maliciously and excessively threatened defendant with charges of trademark infringement in connection with activities that are well beyond the scope of either plaintiff's 1974 federal trademark or plaintiff's common-law trademark rights." Comptek Research, Inc. v. Barrister Legal Support Serv., Inc., Civ. No. 81-0954, 1981 WL 48146, at *1 (D. D.C. Dec. 22, 1981).  While denying the motion to dismiss, the court noted that "the allegations of the antitrust counterclaim are thin."  Id. Nonetheless, the court noted that "an effort to extend a trademark monopoly beyond its legal limits, resulting in actual damage to competitors, though difficult of proof, would be actionable under the Sherman Act."  Id.  The allegations in Comptek Research appear to go beyond the good faith efforts to enforce trademark rights which courts have held do not violate Sherman Act.

The allegations in this case, in contrast, are not that DISH Network maliciously threatened the defendants with trademark infringement "in connection with activities that are well beyond the scope" of their trademark.  Rather, the allegedly infringing actions concern the centrality of the trademarks themselves,

18

albeit the defendants argue that the registrations were improperly granted.  The court does not find Comptek Research on point or persuasive.

Assuming, for the sake of argument, that there has been an injury, the court finds that such injury is not the type which the antitrust laws were intended to prevent.  NicSand, 507 F.3d at 450.  Such a result flows directly from conduct that is not itself an antitrust violation.  Caruana, 2006 WL 2873178, at *5.  In addition, the counterclaim, which alleges that DISH Network is attempting to restrict retailers "from legitimately competing for and serving customers and from using '800' numbers containing a generic or descriptive term that they are entitled to use" does not allege an injury to "competition," but rather harm to specific competitors, i.e., the defendants.  See, e.g., CBC Companies, 561 F.3d at 572; see also Clorox, 117 F.3d at 57; Deflecta-Shield Corp., 1986 WL 4186, at *3 (excessive claim to exclusive rights in words, e.g., descriptive or generic words, not violation of antitrust laws unless it leads to unreasonable restraint of trade).  Thus, the allegations do not support a plausible claim that the defendants have suffered an "antitrust injury" as to the retail market.

C.  Attempted Monopoly

The motion also argues that the antitrust counterclaim should fail because the defendants do not allege a plausible "attempted monopoly."  (Doc. 94, at 10-15.)

The elements of attempted monopolization are:  "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to

monopolize and (3) a dangerous  probability of achieving monopoly power."
Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993).

For there to be "a dangerous probability of monopolization," the party must have the ability to lessen or destroy competition in the relevant market.  Id.  The Sixth Circuit has found that a "dangerous probability" requires "market strength that approaches monopoly power  – the ability to control prices and exclude competition."  Ford v. Stroup, 113 F.3d 1234, 1997 WL 201560,  at *2 (6th Cir. 1997) (TABLE, text in WESTLAW) (citing cases).  A claim for attempted monopolization cannot succeed unless the defendant has market power.  Ford, 1997 WL 201560,  at *2 (citing Spectrum Sports, 506 U.S. at 457).  Generally, monopoly power requires more than sixty percent market power.  Defiance Hosp. v. Fauster-Cameron, Inc., 344 F.Supp.2d 1097, 1112 (N.D. Ohio 2004).

The counterclaim alleges that DISH Network "has engaged in predatory conduct with the specific intent to monopolize both the DBS market and the market for retail services of DBS by impermissibly restricting retailers of its sole competitor, including Dish 1 Up, from legitimately competing for and serving customers and from using '800' numbers containing a generic or descriptive term that they are entitled to use."  (Doc. 89, Counter-Complaint, ¶ 68.)  The court has already determined that the defendants lack standing to assert antitrust claims as to the DBS market.[7]

---

[7]  In any event, the claim for attempted monopolization would fail because DISH Network, according to defendants, has a 45% market share of the DBS

The defendants do not allege, nor is there any indication, that DISH Network is a direct participant in the retail services market.  See, e.g., Doc. 89, Counter-Complaint, at p. 14, ¶ 5, and p. 20, ¶ 26.  The counter-complaint alleges that DISH Network and DirecTV are "unique rivals" in the DBS market.  As to the retail services market:

> In the retail services market, retailers compete for end-user customers, but are subject to licensing terms set by the DBS providers.  Thus, while there is independent competition between retailers in the retailer services market, the competition is limited to and controlled by the DBS providers.

(Doc. 89, Counter-Complaint, at ¶ 25.)

There is no plausible factual allegation that counter-defendant DISH Network itself has "a dangerous probability of achieving monopoly power" in the retail services market.  Spectrum Sports, 506 U.S. at 456.  There is no factual allegation that DISH Network has monopoly power, i.e., more than sixty percent market power, or the ability to achieve such power in that market.  Instead, the defendants argue that, by attempting to restrict competition in the retail services market, DISH Network "is improperly trying to enhance its position in the broader DBS market."  (Doc. 99, at 8-9.)  The "dangerous probability of success" is allegedly that DISH Network "has a dangerous possibility of converting a duopoly [in the DBS market] into a monopoly."  (Doc. 99, at 12.)

---

market, compared to DirecTV's 55% share.  (Doc. 89, Counter-Complaint, at ¶ 71.)

The factual allegations of the counterclaim do not present a plausible claim for attempted monopolization of the retail services market.

### D. Noerr-Pennington Doctrine

Finally, the plaintiff's motion contends that the Sherman Act counterclaim must fail because the conduct at issue is protected by the Noerr-Pennington Doctrine. (Doc. 94, at 15-18.) Under the Noerr-Pennington Doctrine, those who petition the courts and administrative agencies for redress are generally immune from antitrust liability. Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 56-57 (1993) (hereinafter, "PRE") (citing California Motor Transport Co. v. Trucking Unltd., 404 U.S. 508, 510 (1972)); Letica Corp. v. Sweetheart Cup Co., Inc., 790 F.Supp. 702 (E.D. Mich. 1992) (trademark).

The defendants argue that the Noerr-Pennington Doctrine does not shield DISH Network's conduct, because its trademark applications, and its actions to enforce its trademarks, fall within the "sham" exception. (Doc. 99, at 13-15.) Immunity is withheld for "sham" activities which are actually attempts to interfere directly with the business relationships of a competitor. PRE, 508 U.S. at 56. However, "an objectively reasonable effort to litigate cannot be sham regardless of subjective intent." Id. at 57. When pleading the sham exception to the Noerr-Pennington Doctrine, courts have required more specific allegations. Letica, 790 F.Supp. at 705.

22

The Supreme Court has outlined a two-part test for determining whether litigation is a "sham," and thus not entitled to antitrust immunity under the Noerr-Pennington Doctrine.  First, it must be shown that the lawsuit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." PRE, 508 U.S. at 60; In re Cardizem CD Antitrust Litig., 105 F.Supp.2d 618, 643 (E.D. Mich. 2000), aff'd, 332 F.3d 896 (6th Cir. 2003), cert. denied, 543 U.S. 939 (2004).  If an objective party could conclude that the action is reasonably calculated to elicit a favorable outcome, the action is immunized under the Noerr-Pennington Doctrine, and an antitrust claim premised on the "sham" exception fails.  PRE, 508 U.S. at 60.  The Court noted that "[a] winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham." PRE, 508 U.S. at 60 n.5.

The Supreme Court has found that the "existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation." PRE, 508 U.S. at 62.  "Probable cause to institute civil proceedings requires no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication." Id. at 62-63 (internal citations omitted).  The Court held that the existence of probable cause is an absolute defense, which "irrefutably demonstrates that an antitrust plaintiff has not proved the objective prong of the sham exception." Id. at 63.

Only if the challenged action is "objectively meritless" does the court move to the second step, and examine the party's subjective motivation. PRE, 508 U.S. at

23

60; Cardizem, 105 F.Supp.2d at 643.  Under the second part, "the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process – as opposed to the outcome of that process – as an anticompetitive weapon."  PRE, 508 U.S. at 60-61 (internal citations omitted).

The defendants argue that DISH Network "both sought and obtained the trademark registration for the word 'DISH' in order to restrict retailers of its sole competitor from competing for and serving customers and using '800' numbers they are entitled to use."  (Doc. 99, at 14, citing Counter-Complaint, at ¶¶ 68-73.)  They contend that the root of DISH Network's actions was actually an attempt to interfere with a competitor's business.  Id.

DISH Network responds that its registration of its own name is the very antithesis of a sham act.  (Doc. 94, at 16.)  DISH Network alleges that it has marketed and sold satellite television services since 1996 under the registered mark DISH Network.  (Doc. 74, ¶¶ 17, 52.)  In addition, DISH Network contends the defendants do not allege that DISH Network engaged in fraud or any knowing misrepresentation to the Patent and Trademark Office.  (Doc. 94, at 17.)

The defendants have alleged that DISH Network repeatedly attempted to obtain trademark registration for the word "DISH," which defendants contend should have been denied as an improper, generic mark.  See, e.g., doc. 89, at pp. 15-17, ¶¶ 11-16.  The defendants allege that, upon reconsideration of a trademark application which had been denied as descriptive and generic, DISH Network

submitted in support a survey which was "fundamentally flawed, because it was

based on a mere 133 interviews."  Id. at ¶ 16.  The defendants claim that DISH

Network has :

> . . . established a pattern and practice of applying for trademark
> protection on design or "logo" marks that incorporate generic and/or
> merely descriptive words and phrases, disclaiming any rights to the
> generic and merely descriptive portions of those marks in order to
> obtain federal registration, and then — ignoring the fact of their own
> disclaimers — subsequently using those design marks as the
> foundation to assert exclusive trademark rights over the generic and
> merely descriptive words and phrases incorporated therein.

(Doc. 89, Counter-Complaint, at ¶ 19.)

Nevertheless, DISH Network succeeded in obtaining seven registered

trademarks and service marks incorporating the word "DISH."  See doc. 74, ¶¶ 17,

52; see also doc. 12, supporting exhibits to Motion for Preliminary Injunction.

Under the standards for the "sham" exception set forth by the Supreme

Court, it must be shown that the trademark application, or an infringement

lawsuit,  is "objectively baseless in the sense that no reasonable litigant could

realistically expect success on the merits."  PRE, 508 U.S. at 60; Cardizem, 105

F.Supp.2d at 643.  If an objective trademark holder could conclude that the action is

reasonably calculated to elicit a favorable outcome, the action will be immunized

under the Noerr-Pennington Doctrine, and an antitrust claim premised on the

"sham" exception fails.  PRE, 508 U.S. at 60.  The Supreme Court noted that a

positive outcome "is by definition a reasonable effort at petitioning for redress and

therefore not a sham."  PRE, 508 U.S. at 60 n.5.

As to the trademark applications, DISH Network has succeeded in obtaining seven registered trademarks and service marks incorporating the word "DISH," doc. 74, ¶¶ 17, 52, thus these applications cannot be considered "sham."

As to the infringement allegations, for example, the Third Amended Complaint alleges that DISH Network's primary telephone number is 800-333-DISH (3474), and that the defendants are using "confusingly similar phone numbers" of 888-333-DISH (3474) and 866-333-DISH (3474).  (Doc. 74, Third Am.Compl., at ¶¶ 10-11.)  The court finds that an objective trademark holder could conclude that such an infringement action is reasonably calculated to elicit a favorable outcome.  PRE, 508 U.S. at 60.  Without prejudging the claims on the merits, the infringement allegations of the Third Amendment Complaint are supported by probable cause, that is, a reasonable belief that there is a chance that the claims may be held valid upon adjudication.

### E.  Summary

The eighth counterclaim, alleging antitrust violations, should be dismissed for failure to state a plausible claim for relief.  The allegations do not support a plausible claim that the defendants have antitrust standing as to the DBS market. In addition, the allegations do not support a plausible claim that the defendants have suffered an "antitrust injury" as to the retail market.  The factual allegations of the counterclaim do not present a plausible claim for attempted monopolization. Finally, the court finds that the Sherman Act counterclaim must fail because the

conduct at issue is protected by the Noerr-Pennington Doctrine, and the defendants have failed to plausibly allege the sham exception.

### III.  COMMON LAW UNFAIR COMPETITION

The ninth counterclaim alleges common law unfair competition.  (Doc. 89, Counter-Complaint, at ¶¶ 74-77.  The acts which comprise "unfair competition" are not specifically alleged; instead, reference is made to the first 73 paragraphs of the counter-complaint.

Under Ohio law, unfair competition "ordinarily consists of representations by one person, for the purpose of deceiving the public, that his or her goods are those of another."  Landskroner v. Landskroner, 154 Ohio App.3d 471, 490-491, 797 N.E.2d 1002, 1017 (Ohio Ct. App. 2003).  There are some cases which extend the tort to "unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another."  Id. at 491, 797 N.E.2d at 1017 (citing Henry Gehring Co. v. McCue, 23 Ohio App. 281, 154 N.E. 171 (Ohio Ct. App. 1926)).  However, federal courts have held that unfair competition claims may not stand for what are alleged to be antitrust violations.  Invacare Corp. v. Respironics, Inc., No. 1:04 CV 1580, 2006 WL 3022968, at *14 -*15  (N.D. Ohio Oct. 23, 2006) (citing cases).

In Schreiber Foods, Inc. v. Beatrice Cheese, Inc., No. 97-C-11, 1997 WL 34618437 (E.D. Wis. Nov. 26, 1997), the court ruled on an assertion of unfair competition based on inequitable conduct before the PTO, as well as a pre-litigation

27

infringement notice to the competitor's customers.  The court found that federal law preempted the unfair competition claims.  The court pointed out that a state tort claim based on inequitable conduct before the PTO was preempted, and quoted the Federal Circuit that "there is no legal basis for a holding that inequitable conduct, or the assertion of a patent procured through inequitable conduct, constitutes unfair competition."  Id. at *6 (quoting Pro-Mold and Tool Co., Inc. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1574-1575 (Fed. Cir. 1996)).  The same would hold true in the realm of trademark, and the defendants do not provide any authority to the contrary.  See generally doc. 99, at 18-19.

The factual allegations of the counter-complaint specific to the ninth claim do not state a plausible claim to relief for unfair competition.

## IV.  TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

The tenth counterclaim alleges common law tortious interference with prospective business advantage.  (Doc. 89, Counter-Complaint, at ¶¶ 78-81.  The allegation is that DISH Network "tortiously interfered with Defendants' development and acquisition of customers and their service to DirecTV customers." Id. at ¶ 79.

Ohio law allows a cause of action for tortious interference with a prospective economic advantage.  Dryden v. Cincinnati Bell Tel. Co., 135 Ohio App.3d 394, 400, 734 N.E.2d 409, 413-414 (Ohio Ct. App. 1999); Hoyt , Inc. v. Gordon & Assoc., Inc.,

28

104 Ohio App.3d 598, 603, 662 N.E.2d 1088, 1091 (Ohio Ct. App. 1995). The elements of the tort are that a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into a business relationship with another. Fitness Experience, Inc. v. TFC Fitness Equipment, Inc., 355 F.Supp.2d 877, 893 (N.D. Ohio 2004); Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co., 148 Ohio App.3d 596, 604, 774 N.E.2d 775, 780 (Ohio Ct. App. 2002); Dryden, 135 Ohio App.3d at 400, 734 N.E.2d at 413-414.

The defendants do not allege that any particular third party was "purposely caused" not to enter into a business relationship with them. They only make conclusory allegations that DISH Network interfered with their development and acquisition of customers, without stating that any particular customer was lost.

The allegations are not enough to raise a right to relief above the speculative level. Twombly, 550 U.S. at 555. The allegations of the tenth counterclaim do not have facial plausibility, because no factual content has been pleaded that allows the court to draw the reasonable inference that DISH Network is liable for the tortious interference alleged. See generally Iqbal, 129 S.Ct. at 1949.

## V. SUMMARY

The motion to dismiss the 8th, 9th, and 10th counterclaims (doc. 94) should be granted. The eighth counterclaim, alleging antitrust violations, should be dismissed for failure to state a plausible claim for relief, as discussed more fully above. The allegations do not support a plausible claim that the defendants have

antitrust standing as to the DBS market, nor do they support a plausible claim that the defendants have suffered an "antitrust injury" as to the retail market.

The factual allegations of the counter-complaint specific to the ninth claim do not state a plausible claim to relief for unfair competition.  In addition, the allegations of the tenth counterclaim do not have facial plausibility.

<u>RECOMMENDATION</u>

It is recommended that the motion to dismiss the 8th, 9th, and 10th counterclaims (doc. 94) be granted, as outlined above.

Dated:   July  30, 2010                    /s/ Kenneth S. McHargh
                                          Kenneth S. McHargh
                                          United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the District Court's order.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).